TERRAVISTA LANDSCAPE *v.* DIRECTOR, EMPLOYMENT SECURITY DEPARTMENT and Wilfredo Morales

E 04-132                                                    194 S.W.3d 800

Court of Appeals of Arkansas
Opinion delivered October 6, 2004

*Appellant*, pro se.

*Phyllis A. Edwards*, for appellees.

SAM BIRD, Judge. Terravista Landscape & Maintenance appeals the Board of Review's award of employment-security benefits to Wilfredo Morales, who was discharged from his employment as a crew leader on Terravista's landscaping jobs. The Board reversed the Appeal Tribunal's denial of benefits and its finding that Morales was discharged from last work for misconduct connected

with the work, finding instead that Morales was discharged for reasons that did not constitute misconduct connected with the work. We hold that there is insufficient evidence to support this finding by the Board; therefore, we reverse the award of benefits.

The initial determination in this case was made by the Arkansas Employment Security Department, which found that Morales was discharged for failure to meet the work standards of the employer but that he had made reasonable efforts to meet those standards. Noting that inability to perform the work does not constitute misconduct in connection with the work, the Department determined that Morales was not disqualified from receiving unemployment benefits. Terravista appealed the agency's determination to the Appeal Tribunal, challenging the finding that Morales made reasonable efforts to perform his job duties. Terravista asserted in its appeal, "If reasonable effort was extended on his part, he would not have *continually* ignored and disregarded company policy and his supervisor's instructions."

The evidence presented at a hearing conducted before the Appeal Tribunal included testimony by Terravista's president, William Gernen, and by Morales; both Terravista's and Morales's statements concerning discharge; and pages from the employee handbook. A list of Terravista's reasons for dismissal was also admitted into evidence:

> 1) Wilfredo had a blatant disregard for equipment care, contrary to company policy — written and verbal. Wilfredo was instructed to place equipment (various hand tools) in the back of the truck and secure. He would "throw" them in the truck which resulted in breakage and damaged tools.
>
> 2) As a Crew Leader, one of his job responsibilities was to regularly perform maintenance on the equipment. He did not perform this task or even leave the equipment prepared for the next business day, such as leaving a tractor with no fuel or keys for operation.
>
> 3) Wilfredo was responsible for cleaning out his truck, which is in the manual as well as verbally instructed. He ignored this instruction and left truck "trashed out" and did not perform maintenance on the vehicle, i.e., check oil, etc.
>
> 4) As a Crew Leader, he was to be prepared for the work day with proper tools. He often would leave the shop without the proper

items to perform the necessary work and would have to come back to procure them causing much inefficiency in the work day.

5) Wilfredo would play the radio loudly at the job site (customers' homes) which is against employee policy. All employees must treat the client's property with respect. He was warned to keep the volume down; however, he ignored the Supervisor's warning and continued to play music too loud in the residential areas. We had several complaints from customers.

6) Wilfredo never improved in his work ethics or performance. He was never able to complete a job in a timely manner to Terravista standards. When instructed how to do a job, he would ignore the instruction and seem to purposely do the job slower.

He was released because of continually working contrary to company policy and instruction.

Geren testified at the hearing that Morales had been discharged for breaking company policy and for blatant disregard of policy. Geren testified that there were "several things day after day" leading to the dismissal rather than a single incident, but that the final thing had been Morales's playing the radio loudly at clients' residences, contrary to the handbook policy that employees be responsible and professional to customers and clients. Geren stated that the manager of the landscape crew, Gabe Morris, heard the radio playing loudly and that the company received phone calls and complaints from clients about it. Geren said that this had occurred five or six times over several months, that Morales was told to turn the radio down, but that he would turn it up when the manager left a job site.

Geren also testified regarding Morales's disregard for the company policy of keeping the trucks clean and taking care of equipment. He said that company policy required that all personal trash be cleaned out of the trucks daily and the tools be put away, that Morales was warned several times by Morris that the trash was to be cleaned out, but that Morales neglected this policy just as he did the radio policy, leaving his truck in the afternoon with all the trash in it and all the tools on it. Geren testified that Morales had been warned six times for failure to clean his truck and for not putting up tools and equipment, but that his response was just to acknowledge it with a shrug and then ask for more money.

Geren testified that company policy also directed that equipment be properly cared for and maintained, but that oftentimes

Morales and laborers under his supervision threw heavy pieces of equipment on top of hand tools in the truck, breaking and cracking handles of shovels and rakes, and that this went on over a period of several months. Geren testified that Morales was instructed to use a tractor to load mulch and other materials, that company policy required an employee to be responsible for his tools, that Morales would nearly run the tractor out of fuel and leave it for someone else to fill up, and that he would not clean the mulch from the air filter in the radiator's grill. Geren testified that Morales was warned several times but would just seem to shrug each time. Geren stated, "If he wasn't going to be paid more that's the way he was going to treat the equipment. That he didn't care." Geren said that this was hearsay from other employees who, like Morales, spoke Spanish, but that Morales's attitude was personified by his actions.

Geren also said that Morales had been warned at least a dozen times to load his truck at day's end to be ready for the next day. Geren said Morris finally gave up on instructing Morales because he wouldn't cooperate, and that the decision for termination was made after all the complaints and problems. Geren testified that it was Morris who had direct knowledge of the incidents mentioned above; and that, once, after Geren had been on a job site and had instructed Morales how pipe was to be glued, Morris told him that Morales resumed doing the pipe the way he wanted to rather than the way he had been shown. Geren stated that Morales was discharged not for specific incidents, but for his general attitude of not being willing to improve in his work abilities, and not following company directives but continually asking for more money.

Morales, testifying through an interpreter, said that he had been fired. He acknowledged receiving a copy of the company handbook. He said that the reasons Geren gave for firing him were working too slowly and not cleaning up the truck properly. Morales said that workers were told they could play the radio but not too loudly. He said that he was never warned that he was playing his radio too loudly, and he denied doing so. He said that he had been instructed to clean his truck on a daily basis, and he said that he always cleaned it and got the bottles and cans out. He said that the tools were always put back in their places and were never thrown around, that broken handles and other things occurred because of the old age of the tools, and that once a handle might have been replaced because it wasn't good any more. He said that he never failed to refuel the tractor, or to put air filters and

radiators filters into the tractor. He said variously that he forgot to do the oil, that this was a job for a mechanic, that one or two times he was told to change the oil and he did, and that "we changed the oil every day."

Geren asked that the record reflect, because Morales had brought up the subject, that he had been instructed to change the oil in the skid loader and the tractor, that Morales had neglected to do so, and that someone else had to do it. Geren asked Morales why the tractor's air filter and radiator filter guards were caked with mulch several times when Geren checked the equipment after Morales had been loading mulch and had left work. Morales responded, "He knows that I wasn't the only one or only group to have those vehicles. Other groups had them, too. Why is he blaming me?"

At the conclusion of the hearing, each party was given an opportunity to discuss anything not previously brought to the attention of the hearing officer. Morales commented, "I said before if I was not doing something right, why wasn't I told in nine months of working for that company?" Geren responded that on three occasions Morales had come to Geren's office asking for more money, and that he had been told the things he needed to do to improve his work: keep the truck cleaned better and do a better job following instructions from Morris.

An individual shall be disqualified for benefits if he or she is discharged from his or her last work for misconduct in connection with the work. Ark. Code Ann. § 11-10-514(a)(1) (Repl. 2002). In *Willis Johnson Co. v. Daniels*, 269 Ark. 795, 601 S.W.2d 890 (Ark. App. 1980), we explained that "misconduct," for purposes of unemployment compensation cases, must be:

> an act of wanton or willful disregard of the employer's interest, a deliberate violation of the employer's rules, a disregard of standards of behavior which the employer has the right to expect of his employees, or negligence in such degree or recurrence as to manifest culpability, wrongful intent, or evil design, or show an intentional substantial disregard of the employer's interest or of the employee's duties and obligations to the employer.

> Mere inefficiency, unsatisfactory conduct, failure of good performance as the result of inability or incapacity, inadvertencies, ordinary negligence or good faith errors in judgment or discretion are not considered misconduct for unemployment insurance pur-

poses unless it is of such a degree or recurrence as to manifest culpability, wrongful intent, evil design, or an intentional or substantial disregard of an employer's interests or an employee's duties and obligations.

*Willis,* 269 Ark. at 800, 601 S.W.2d at 892–93 (citations omitted).

■■ In order for misconduct to occur, there must be an element of intent. *See id.* Whether the employee's acts are willful or merely the result of unsatisfactory conduct or unintentional failure of performance is a fact question for the Board to decide. *George's, Inc. v. Director,* 50 Ark. App. 77, 900 S.W.2d 590 (1995). On appeal, the findings of fact of the Board of Review are conclusive if they are supported by substantial evidence. *Greenberg v. Director,* 53 Ark. App. 295, 922 S.W.2d 5 (1996). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.*

The Board noted that shortcomings in Morales's work had been going on for months prior to the discharge. The Board's opinion included the following analysis:

> The employer never provided a written warning to the claimant. The testimony of the president indicates that the claimant was verbally warned about his conduct but other testimony indicates that the president may have been referring to the fact that he mentioned the shortcomings when he was being denied a requested raise. If so, this would not put the claimant on notice that his failures were so great that if such conduct continued, he might be discharged.

The Board noted that Morales was discharged for a variety of reasons. It found that Terravista's president witnessed "incidents of the claimant failing to clean the truck of trash and put away equipment and apparently of heavy items being found stored on top of hand tools," but that this had gone on for months without the employer taking any adverse action against Morales. Additionally, the Board noted that the president "was a direct witness to the filters being filled with mulch at the end of the claimant's shift, indicating that the claimant had failed to clean them or that he had not done a very good job of cleaning them," but that this problem also had gone on for months with no apparent adverse action being taken. The Board concluded:

> The claimant's job performance was frequently poor in that he failed to properly clean equipment and put up tools over a period of

several months. This might constitute a good business reason to discharge the claimant but it does not necessarily mean that the claimant's conduct amounted to misconduct. As the claimant's conduct does not appear to be worse than the conduct in *Greenberg* [*v. Director*, 53 Ark. App. 295, 922 S.W.2d 5 (1996)], the Board is unable to conclude that the claimant's conduct rises to a level to constitute a willful disregard of the interests of the employer.

Contending that the Board's findings and conclusions were not based on the evidence presented, Terravista states that its rules and consequences for breaking them are clearly explained in the company handbook that Morales acknowledged receiving. Terravista argues that Morales did not meet his obligations as a crew leader or as a trustworthy employee, and that he ignored job responsibilities and direct instruction from his supervisor. It characterizes that as a case of termination after all "chances" had been exhausted: it argues that verbal correction of shortcomings in behavior that continued off and on for several months indicated the company's patience with Morales and its optimism that he would eventually and consistently improve.

The company handbook includes directives that all personal trash must be cleaned out of company trucks at day's end, that associates must be responsible and professional to the clients, and that each associate must exhibit responsibility for tools, equipment, vehicles, and properties. The handbook also states the following:

> To be successful, a business requires associates who use their working hours in the most productive and efficient way. When an associate does not cooperate in this group effort, it may be necessary to apply disciplinary action in the form of a warning, a suspension without pay, or even discharge. For cases of minor misconduct, the associate will first be given an oral warning. *Repeated misconduct will result in a written warning, time off without pay or termination*, depending on the seriousness of the action.

(Emphasis added.)

The company handbook describes a general standard of proficiency expected of employees and sets out specific tasks to be performed by employees. The handbook provides that employees whose performance does not conform to the standard will be subject to disciplinary action, which may be "in the form of a warning, suspension without pay, or even discharge." The hand-

book provides that while "minor misconduct" will result in an oral warning, "repeated misconduct will result in a written warning, time off without pay, or termination." Clearly, the handbook does not mandate that either an oral or written warning be given to employees before their termination, and does not require that a claimant be put on notice that his failures were so great that if such conduct continued, he might be discharged. We hold that substantial evidence does not support the Board's conclusion that Morales was entitled to written notice before discharge for repeated shortcomings on the job.

We now must examine the shortcomings in Morales's job performance to determine whether they constituted misconduct within the meaning of our employment-security law. In *Greenberg, supra,* cited by the Board in its decision, the claimant was a legal secretary discharged for poor job performance. The evidence showed that she had failed to properly spell-check various documents, had repeatedly failed to follow the direct instructions of the supervisor to mark important dates on a calendar, and had failed to include important documents in a letter after having been instructed to do so. We held that this evidence proved that the claimant was an incompetent legal secretary. We reversed the Board's finding of misconduct, however, holding that reasonable minds would not accept this evidence of incompetence as adequate to support a conclusion that the appellant's conduct was of such a degree or recurrence as to manifest culpability, wrongful intent, evil design, or an intentional or substantial disregard of her employer's interests or duties and obligations. *Id.* at 298, 922 S.W.2d at 7.

The Board in the present case found that Morales's conduct was not worse than the conduct in *Greenberg, id.,* and thus the Board was unable to conclude that the claimant's conduct rose to a level to constitute a willful disregard of the interests of the employer. The Board has misread *Greenberg,* and its attempted analogy with the present case must fail: the evidence in *Greenberg,* rather than showing a disregard for company rules or policy, merely showed the claimant's incompetence as a legal secretary. The determination of misconduct depends on whether the acts were willful or whether they merely resulted from unsatisfactory conduct or unintentional failure of performance: it is not dependent on how poorly the job was performed. *See id.; George's, Inc. v. Director, supra.*

In *Greenberg, supra,* there was not evidence regarding company policy or specifying what tasks the employee was required to perform. Although the Board acknowledged that Morales's job performance was frequently faulty in that he failed to properly clean equipment and put up tools over a period of several months, the Board failed to consider that these were essential tasks outlined in the company rule book. As mentioned previously, substantial evidence does not support the Board's conclusion that Morales was entitled to written notice that the company would not tolerate his repeated shortcomings in performing tasks that he was required to do. We also hold that reasonable minds could not agree with the Board's findings that Morales's conduct did not rise to a level constituting a willful disregard of the interests of the employer, and that he was discharged for reasons that did not constitute misconduct connected with the work. The award of benefits is reversed.

Reversed and remanded for proceedings in keeping with this opinion.

CRABTREE and ROAF, JJ., agree.