Beverly J. TATE *v.* DIRECTOR, DEPARTMENT of WORKFORCE SERVICES

E 07-107 269 S.W.3d 402

Court of Appeals of Arkansas
Opinion delivered December 5, 2007

Appellant, pro se.

*Phyllis A. Edwards,* for appellee.

D.P. MARSHALL JR., Judge. Beverly Tate challenges the Board of Review's decision that she was not entitled to unemployment benefits because the University of Arkansas fired her with cause for insubordination. Ark. Code Ann. § 11-10-514(a)(1) (Supp. 2007). Whether Tate's actions constituted misconduct in connection with her work was a fact question for the Board to answer. *Terravista Landscape v. Williams,* 88 Ark. App. 57, 64, 194 S.W.3d 800, 804 (2004). The question for this court is whether substantial evidence supports the Board's decision. *Ibid.* It does.

During the six months that Tate was in her last position at the University, she arrived late for work several times. At first, Tate wanted to make up for her tardiness, which was usually about fifteen minutes, by working during her break or her lunch time. Tate's supervisor instructed her that she could not do so, and instead must use some of her leave time to cover the tardiness. Tate questioned this interpretation of University policy. Tate and her supervisor consulted with the Associate Vice-Chancellor for Human Resources, who confirmed the supervisor's interpretation. When Tate was late again, her supervisor reminded her of the rules. Tate again sought to avoid using up her leave time and wanted to work during her breaks. Her supervisor refused, and suggested that Tate consult the supervisor's boss under the University's "open-door" policy. Tate did so. He declined to intervene, e-mailing Tate that she should sort the matter out with her supervisor.

A few weeks later, Tate was late two days in a row. When her supervisor told her to use leave time for this tardiness, Tate again said that she would just make up the time by working through her breaks. The supervisor refused, and told Tate that her attitude on this matter and others needed to improve. When Tate asked the supervisor to put that in writing, the supervisor discharged Tate.

■ This record contains substantial evidence that supports the Board's decision. Asking questions about an employer's policy is not insubordination. Asking the employer to change or interpret the policy is not insubordination. But after the questions are asked and the requested accommodation is rejected, then an employee who refuses to accept the employer's decision about the rules for the workplace is insubordinate. Tate would not take no for an answer. She never indicated to her supervisor that she would comply with her instructions. Substantial evidence supports the Board's decision that Tate's repeated attempt to disregard the University's time policies ripened into misconduct. *Terravista Landscape, supra.*

Affirmed.

PITTMAN, C.J., GLADWIN, ROBBINS, GLOVER and VAUGHT, JJ., agree.

HEFFLEY, BAKER and MILLER, JJ., dissent.

KAREN R. BAKER, Judge, dissenting. At the time of her termination, Ms. Tate was classified as an employee with more than seven years of full-time service. She had worked in hourly and work study capacities at the University in addition to the salaried position from which she was terminated. Nothing in the record indicates any disputes regarding Ms. Tate's timekeeping practices pursuant to the University's policy until she was transferred and placed under Ms. Seller's supervisory authority. The dispute that led to termination arose when Ms. Seller required Ms. Tate to use her leave time, that could be taken only in fifteen minute intervals, to address two sequential late arrivals of less than fifteen minutes. In presenting her understanding of her employer's policy, Ms. Tate explained that she had witnessed the University's progressive employment practices over a twelve-year time span. In expressing her understanding of the University's approach to work schedules, she quoted the following excerpt from an article entitled "U of A Receives Silver Family Friendly Award:"

> As the university works to help employees maintain a work-life balance, it offers "a lot of work-time options, everything from flexible hours, compressed workweeks, permanent part time and telecommuting," Taylor (Barbara Taylor, associate vice chancellor for human relations) said. "As an employer, the university strives to provide its employees with convenience and many choices."

Regarding flexible hours, Ms. Tate included the following provision from the employment handbook:

> You and your supervisor may agree to a work week with a time schedule that differs from the regular daily schedule if it serves both your needs and those of the University. The schedule must not create a pattern of overtime work or cause undue hardship for your work unit. Any flex-time agreements that you make must be put in writing and be signed by you and your supervisor.

Ms. Tate related in her history of Ms. Seller's application of the University's policy to her an incident that occurred within the first month of Ms. Tate being transferred to Ms. Seller's supervision. In that instance, Ms. Seller refused to authorize overtime worked by Ms. Tate. Instead, Ms. Seller adjusted Ms. Tate's leave time, rather than paying overtime. Ms. Tate also explained that she was normally five to ten minutes early to work each day and that on occasion would begin working thirty minutes earlier than the scheduled day.

Furthermore, Ms. Tate explained that she followed the University's open-door policy in pursuing a clarification of Ms. Seller's application of the policy:

> [T]he university does have an open-door policy, and employees are, and can, and the option is available to employees to ask and to question, and that's exactly what I was doing, and that is not insubordinate and not disrespectful to take advantage of the open-door policy. It's in the university handbook.

Ms. Seller not only acknowledged the employer's open-door policy but stated that she encouraged Ms. Tate to talk to Don Peterson, Ms. Seller's supervisor. Nevertheless, she maintained that the reason for Ms. Tate's termination was the insubordination and disrespect that she showed toward Ms. Seller.

Of particular importance to the issue before us are three exhibits regarding the use of breaks. The first is an email from Ms. Seller to Barbara Taylor making the following request: "Barbara, Beverly and I have a question about work breaks. Can you please explain the law requirements and then the University's position on them?" The second is the response from Ms. Taylor to Ms. Seller and copied to Ms. Tate. This email is several pages and begins with the following statement: "The answer to your question is a

somewhat complicated one, as it involves both the Federal Fair Labor Standard Act (FSLA) and state regulations." The last email is from Ms. Seller to Ms. Tate that states simply: "Yes, if you need breaks, you can take one mid morning not to exceed 15 minutes and one mid afternoon not to exceed 15 minutes."

Ms. Arbuthnot testified that Ms. Tate was terminated, not for her usage of the time, but for "continually arguing about the time usage." Ms. Seller testified that "Beverly was terminated for insubordination and disrespect to my position as her supervisor, not for being tardy, but for continually arguing with me about the use of her breaks to shorten her day, to fill in time that she was late." Ms. Tate testified that she questioned the policy regarding the time usage as applied by Ms. Seller because she believed that the application was inappropriate to her position as a salaried employee. The Board of Review found that Ms. Tate "was not discharged for 'questioning' time keeping practices or for 'being late.' She was discharged for being insubordinate." The majority's affirmance is in direct contradiction to the evidence in this case and the public policy that is our duty to protect.

Statutes are to be construed with reference to the public policy which they are designed to accomplish. *Commercial Printing Co. v. Rush*, 261 Ark. 468, 549 S.W.2d 790 (1977); *Ark. Tax Comm'n v. Crittenden County*, 183 Ark. 738, 38 S.W.2d 318 (1931). As the supreme court stated in *Little Rock Furniture Mfg. Co. v. Commr. of Labor*, 227 Ark. 288, 298 S.W.2d 56 (1957), our Employment Security Act must be given an interpretation in keeping with the declaration of state policy. The intent of the Arkansas Legislature controls the construction of our unemployment security laws. *Feagin v. Everett*, 9 Ark. App. 59, 66, 652 S.W.2d 839, 843 (1983). In addition, the Employment Security Act is remedial in nature and must be liberally construed in order to accomplish its beneficent purpose. *Graham v. Daniels*, 269 Ark. 774, 601 S.W.2d 229 (Ark. App.1980).

Unemployment benefits are intended to benefit employees who lose their jobs through no fault or voluntary decision of their own. They are not intended to penalize employers or reward employees, but to promote the general welfare of the State. *Wacaster v. Daniels*, 270 Ark. 190, 194, 603 S.W.2d 907, 910 (Ark. App. 1980). The policy of the Arkansas Employment Security Act is "to encourage employers to provide more stable employment" and to accumulate "funds during periods of employment from

which benefits may be paid for periods of unemployment." Ark. Code Ann. § 11-10-102(2) (Repl. 2002).

Our supreme court has explained that the purpose of the eligibility and disqualification provisions of an unemployment compensation statute is to protect the state unemployment compensation fund against claims of individuals who would prefer benefits to jobs. *Garrett v. Cline*, 257 Ark. 829, 832, 520 S.W.2d 281, 284 (1975) (citations omitted). The eligibility and disqualification provisions, being in pari materia, are to be construed together. *Id.* at 832-33, 520 S.W.2d at 284.

Arkansas Code Annotated section 11-10-514(a)(1) (Repl. 2002) provides, "If so found by the Arkansas Employment Security Department, an individual shall be disqualified for benefits if he or she is discharged from his or her last work for misconduct in connection with the work. "Misconduct," for purposes of unemployment compensation, involves (1) disregard of the employer's interest; (2) violation of the employer's rules; (3) disregard of the standards of behavior which the employer has a right to expect; and (4) disregard of the employee's duties and obligations to his employer. *Rossini v. Director*, 81 Ark. App. 286, 101 S.W.3d 266 (2003). To constitute misconduct, however, the definitions require more than mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies, ordinary negligence in isolated instances, or good-faith errors in judgment or discretion. *Id.* Instead, there is an element of intent associated with a determination of misconduct. *Blackford v. Director*, 55 Ark. App. 418, 935 S.W.2d 311 (1996). There must be an intentional and deliberate violation, a willful and wanton disregard, or carelessness or negligence of such a degree or recurrence as to manifest wrongful intent or evil design. *Rossini v. Director, supra.* Misconduct contemplates a willful or wanton disregard of an employer's interest as is manifested in the deliberate violation or disregard of those standards of behavior which the employer has a right to expect from its employees. *Blackford v. Director, supra.*

The employer has the burden of proving misconduct by a preponderance of the evidence. *Arkansas Midland R.R. v. Director*, 87 Ark. App. 311, 191 S.W.3d 544 (2004). Additionally, the credibility of witnesses and the weight to be accorded their testimony are matters to be resolved by the Board. *Williams v. Director*, 79 Ark. App. 407, 88 S.W.3d 427 (2002).

In this case, the evidence showed that the law governing the University's policy was complicated and that the use of breaks was flexible. Nevertheless, the Board found that Ms. Tate's attempts to clarify the use of breaks was insubordination, although the board also found that she was not terminated for questioning the policy. Despite this flawed circular reasoning, the majority affirms.

Nothing in this record indicates that Ms. Tate is attempting to receive unemployment benefits in lieu of work. It is our duty to interpret the statutes regarding misconduct and determine whether the evidence can support the Board's determination. Nothing in this record can support the Board's finding that Ms. Tate was insubordinate and that her insubordination manifested a wrongful intent or evil design against her employer.

Accordingly, I dissent.

HEFFLEY and MILLER, JJ., join.